656 N.W.2d 195 (2002)
Patricia GRAVES and Frank Amedure, Sr., as Personal Representatives of the Estate of Scott Amedure, Deceased, Plaintiffs-Appellees,
v.
WARNER BROS., Jenny Jones Show, and Telepictures, jointly and severally, Defendants-Appellants.
Docket No. 226645.
Court of Appeals of Michigan.
Submitted July 9, 2002, at Detroit.
Decided October 22, 2002, at 9:10 a.m.
Released for Publication January 23, 2003.
*197 Fieger, Fieger, Schwartz & Kenney, P.C. (by Geoffrey N. Fieger, Ven R. Johnson, and Tammy J. Reiss), Southfield, for the plaintiffs.
Feeney Kellett Wienner & Bush, P.C. (by James P. Feeney, Bloomfield Hills, Sarah A. McLaren, and Paul L. Nystrom) (Patricia J. Boyle, of counsel), White Lake, for the defendants.
Honigman Miller Schwartz and Cohn (by Herschel P. Fink, Cynthia G. Thomas, and Dean M. Googasian), Detroit, Amici Curiae, for Detroit Free Press, Inc., National Broadcasting Company, Inc., ABC, Inc., CBS, Inc., and Fox Broadcasting Company.
Before: MURPHY, P.J., and GRIFFIN and METER, JJ.
GRIFFIN, J.
Defendants appeal as of right from the entry of judgment in the amount of $29,332,686 following the jury's verdict in plaintiffs' favor in this wrongful death action. We reverse the judgment, vacate the court's order, and remand for entry of a judgment and order in favor of defendants, holding that under the circumstances defendants owed no legally cognizable duty to protect plaintiffs' decedent from the homicidal acts of a third party.

I
The instant case has its origins in the tragic murder of plaintiffs' decedent, Scott Amedure, in March of 1995 by Jonathan Schmitz, who was ultimately convicted of second-degree murder. The facts underlying *198 the highly publicized criminal case are set forth in this Court's decision, People v. Schmitz, 231 Mich.App. 521, 523, 586 N.W.2d 766 (1998), which addressed Schmitz' original appeal of his murder conviction:
This case arises from defendant's killing of Scott Amedure with a shotgun on March 9, 1995. Three days before the shooting, defendant appeared with Amedure and Donna Riley in Chicago for a taping of an episode of the Jenny Jones talk show, during which defendant was surprised by Amedure's revelation that he had a secret crush on him. After the taping, defendant told many friends and acquaintances that he was quite embarrassed and humiliated by the experience and began a drinking binge.
On the morning of the shooting, defendant found a sexually suggestive note from Amedure on his front door. Defendant then drove to a local bank, withdrew money from his savings account, and purchased a 12-gauge pump-action shotgun and some ammunition. Defendant then drove to Amedure's trailer, where he confronted Amedure about the note. When Amedure just smiled at him, defendant walked out of the trailer, stating that he had to shut off his car. Instead, defendant retrieved the shotgun and returned to the trailer. Standing at the front door, defendant fired two shots into Amedure's chest, leaving him with no chance for survival. Defendant left the scene and telephoned 911 to confess to the shooting.
Following a jury trial, Schmitz was found guilty of second-degree murder and possession of a firearm during the commission of a felony; however, this Court reversed the conviction and remanded the case for a new trial on the basis of an error concerning peremptory challenges and jury selection. Schmitz, supra. On remand, Schmitz was again found guilty of second-degree murder and felony-firearm and sentenced to twenty-five to fifty years' imprisonment for the murder conviction. His conviction and sentence were affirmed by this Court in People v. Schmitz, unpublished opinion per curiam of the Court of Appeals, issued January 22, 2002 (Docket No. 222834, 2002 WL 99740).
In the wrongful death action now before this Court, plaintiffs Patricia Graves and Frank Amedure, Sr., as personal representatives of the estate of Scott Amedure, deceased, alleged that Schmitz shot and killed Amedure as a direct and proximate result of the actions of the present defendants, the Jenny Jones Show (the show), its owner, Warner Bros., and its producer, Telepictures.[1] Plaintiffs essentially contended that defendants "ambushed" Schmitz when they taped the episode of the show in question,[2] intentionally withholding from Schmitz that the true topic of the show was same-sex crushes and never attempting to determine, before the show, the effect the ambush might have on Schmitz. Plaintiffs alleged that defendants knew or should have known that their actions would incite violence, with the sole purpose of the show being the increase in television ratings, and that defendants had an affirmative duty to prevent or refrain from placing plaintiffs' decedent in a position that would unnecessarily and unreasonably expose him to the risk of harm, albeit the criminal conduct of a third *199 person. Plaintiffs maintained that the show breached its duty and foreseeably subjected plaintiffs' decedent to an unreasonable risk of harm, ultimately resulting in his death.
Defendants' motions for summary disposition and a directed verdict were denied by the trial court, which opined that there were genuine issues of material fact regarding duty and foreseeability, negligence, and causation. Following extensive trial proceedings, a jury returned a verdict in plaintiffs' favor, and a judgment was subsequently entered thereon awarding plaintiffs $29,332,686 in damages. The trial court denied defendants' posttrial motion for judgment notwithstanding the verdict or, in the alternative, a new trial or remittitur. Defendants now appeal.

II
In defendants' first issue on appeal, we are confronted with the cornerstone of this case whether defendants owed a duty to plaintiffs' decedent to protect him from harm caused by the criminal acts of a third party, Jonathan Schmitz. Defendants argue that they owed no such duty and that the trial court erred in denying defendants relief as a matter of law where plaintiffs failed to show a duty to prevent Schmitz' violent conduct. We agree.
Motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict are reviewed de novo. Badalamenti v. William Beaumont Hosp., 237 Mich.App. 278, 284, 602 N.W.2d 854 (1999); Meagher v. Wayne State Univ., 222 Mich.App. 700, 708, 565 N.W.2d 401 (1997); Turner v. Mercy Hosps. & Health Services of Detroit, 210 Mich.App. 345, 348, 533 N.W.2d 365 (1995); Jenkins v. Southeastern Michigan Chapter, American Red Cross, 141 Mich.App. 785, 792, 369 N.W.2d 223 (1985).
A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. Under subsection C(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. The trial court should grant the motion if the affidavits or other documentary evidence show that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), and (G)(4). Maiden v. Rozwood, 461 Mich. 109, 120, 597 N.W.2d 817 (1999); Quinto v. Cross & Peters Co., 451 Mich. 358, 547 N.W.2d 314 (1996).
In reviewing a trial court's decision on a motion for a directed verdict, this Court must examine the evidence and all reasonable inferences that may be drawn from it in a light most favorable to the nonmoving party. Clark v. Kmart Corp., 465 Mich. 416, 418, 634 N.W.2d 347 (2001); Mason v. Royal Dequindre, Inc., 455 Mich. 391, 397, 566 N.W.2d 199 (1997). Only if the evidence so viewed fails to establish a claim as a matter of law should the motion be granted. Clark, supra at 418-419, 634 N.W.2d 347. The same standard applies in reviewing motions for judgment notwithstanding the verdict. Orzel v. Scott Drug Co., 449 Mich. 550, 557-558, 537 N.W.2d 208 (1995).
Questions about whether a duty exists are for the court to decide as a matter of law. Mason, supra; Murdock v. Higgins, 454 Mich. 46, 53, 559 N.W.2d 639 (1997); Scott v. Harper Recreation, Inc., 444 Mich. 441, 448, 506 N.W.2d 857 (1993). The fundamental principles concerning the threshold issue of duty in a negligence action are well established and have been set forth in detail on numerous occasions by our courts. See, generally, Case v. Consumers Power Co., 463 Mich. 1, 6, 615 *200 N.W.2d 17 (2000); Maiden, supra; Murdock, supra; Buczkowski v. McKay, 441 Mich. 96, 100-101, 490 N.W.2d 330 (1992); Friedman v. Dozorc, 412 Mich. 1, 22, 312 N.W.2d 585 (1981); Moning v. Alfono, 400 Mich. 425, 437, 254 N.W.2d 759 (1977); Krass v. Tri-County Security, Inc., 233 Mich.App. 661, 667-668, 593 N.W.2d 578 (1999); Baker v. Arbor Drugs, Inc., 215 Mich.App. 198, 203, 544 N.W.2d 727 (1996). Briefly reiterated, a negligence action may be maintained only if a legal duty exists that requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm. Maiden, supra at 131-132, 597 N.W.2d 817. This analysis requires a determination whether the relationship of the parties is the sort that a legal obligation should be imposed on one for the benefit of another. Id.; Friedman, supra. In determining whether a duty exists, courts examine different variables, including
foreseeability of the harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach. [Krass, supra at 668-669, 593 N.W.2d 578].
See also Buczkowski, supra at 100-101, 490 N.W.2d 330; Terry v. Detroit, 226 Mich.App. 418, 424, 573 N.W.2d 348 (1997).
Of particular import to the present appeal is the principle that, in general, there is no legal duty obligating one person to aid or protect another. Krass, supra at 668, 593 N.W.2d 578. Moreover, an individual has no duty to protect another from the criminal acts of a third party in the absence of a special relationship between the defendant and the plaintiff or the defendant and the third party. Murdock, supra at 54, 559 N.W.2d 639; Buczkowski, supra at 103-104, 490 N.W.2d 330; Smith v. Jones, 246 Mich. App. 270, 275, 632 N.W.2d 509 (2001); Krass, supra at 668-669, 593 N.W.2d 578; Marcelletti v. Bathani, 198 Mich.App. 655, 664, 500 N.W.2d 124 (1993). The rationale underlying this general rule is the fact that "[c]riminal activity, by its deviant nature, is normally unforeseeable." Papadimas v. Mykonos Lounge, 176 Mich.App. 40, 46-47, 439 N.W.2d 280 (1989). Our Court in Papadimas, id. at 47, 439 N.W.2d 280, quoting Prosser & Keeton, Torts (5th ed.), § 33, p. 201, emphasized that "`[u]nder all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.'" As further explained by our Supreme Court in Williams v. Cunningham Drug Stores, Inc., 429 Mich. 495, 498-499, 418 N.W.2d 381 (1988):
In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another.
Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant.... The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to *201 the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety.
See also Ross v. Glaser, 220 Mich.App. 183, 186-187, 559 N.W.2d 331 (1996); 2 Restatement of Torts, 2d, § 315, p. 122.
"Such a special relationship must be sufficiently strong to require a defendant to take action to benefit the injured party." Murdock, supra at 54, 559 N.W.2d 639. Examples of the requisite "special relationship" recognized under Michigan law include a common carrier that may be obligated to protect its passengers, an innkeeper his guests, an employer his employees, owners and occupiers of land their invitees, a doctor his patient, and business invitors or merchants their business invitees. Id.; Buczkowski, supra at 103-104, 490 N.W.2d 330; Krass, supra at 670-671, 593 N.W.2d 578; Marcelletti, supra at 664, 500 N.W.2d 124; Bell & Hudson, P.C. v. Buhl Realty Co., 185 Mich.App. 714, 718, 462 N.W.2d 851 (1990); Moore v. St. Joseph Nursing Home, Inc., 184 Mich.App. 766, 768, 459 N.W.2d 100 (1990). In this context, our courts have established a duty of reasonable care toward only those parties who are "`readily identifiable as [being] foreseeably endangered.'" Mason, supra at 398, 566 N.W.2d 199, quoting Murdock, supra at 58, 559 N.W.2d 639. See also Jenks v. Brown, 219 Mich.App. 415, 421, 557 N.W.2d 114 (1996); Marcelletti, supra at 665, 500 N.W.2d 124. As the Mason Court noted, "`Readily' is defined as `promptly; quickly; easily.'" Mason, supra at 398, 566 N.W.2d 199, quoting The Random House College Dictionary (rev. ed.).
In its most recent pronouncement in this regard, our Supreme Court, in MacDonald v. PKT, Inc., 464 Mich. 322, 628 N.W.2d 33 (2001), revisited the issue of a merchant's duty to protect business invitees from the criminal acts of third parties and substantially narrowed the scope of the duty owed by a premises owner to his invitee. The plaintiff in MacDonald brought an action against the defendant PKT, Inc. (Pine Knob), for injuries suffered during a concert at the defendant's theater as a result of sod being thrown by other concertgoers. She alleged that the defendant was negligent in failing to provide proper security, failing to stop the performance when it should have known that continuing the performance would incite the crowd, failing to screen the crowd to eliminate intoxicated individuals, and by selling alcoholic beverages. The Court held that merchants have a duty to respond reasonably to situations occurring on their premises that pose a risk of imminent and foreseeable harm to identifiable invitees; however, the duty to respond is limited to reasonably expediting the involvement of the police, and there is no duty to otherwise anticipate and prevent the criminal acts of third parties. The Court stated in pertinent part:
To summarize, under Mason [v. Royal Dequindre, Inc, supra], generally merchants "have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." Id. at 405[, 566 N.W.2d 199 (1997) ]. The duty is triggered by specific acts occurring on the premises that pose a risk of imminent and foreseeable harm to an identifiable invitee. Whether an invitee is readily identifiable as being foreseeably endangered is a question for the factfinder if reasonable minds could differ on this point. See id. at 404-405[, 628 N.W.2d 33]. While a merchant is required to take reasonable measures in response to an ongoing situation that is taking place on the premises, there is no obligation to otherwise anticipate the criminal *202 acts of third parties. Consistent with Williams [v. Cunningham, supra ], a merchant is not obligated to do anything more than reasonably expedite the involvement of the police. We also reaffirm that a merchant is not required to provide security guards or otherwise resort to self-help in order to deter or quell such occurrences. Williams, supra. [MacDonald, supra at 338, 628 N.W.2d 33 (emphasis added).]
The MacDonald Court, id. at 334, n. 10, 628 N.W.2d 33, expressly overruled that portion of Mason that indicated that a merchant has a duty to take precautions against the criminal conduct of third persons that may be reasonably anticipated. The Court explained that
a merchant has no obligation generally to anticipate and prevent criminal acts against its invitees.... [W]e have never recognized as "foreseeable" a criminal act that did not ... arise from a situation occurring on the premises under circumstances that would cause a person to recognize a risk of imminent and foreseeable harm to an identifiable invitee. Consequently, a merchant's only duty is to respond reasonably to such a situation. To hold otherwise would mean that merchants have an obligation to provide what amounts to police protection....
A premises owner's duty is limited to responding reasonably to situations occurring on the premises because, as a matter of public policy, we should not expect invitors to assume that others will disobey the law. A merchant can assume that patrons will obey the criminal law. See People v. Stone, 463 Mich. 558, 565, 621 N.W.2d 702 (2001), citing Prosser & Keeton, Torts (5th ed.), § 33, p. 201; Robinson v. Detroit, 462 Mich. 439, 457, 613 N.W.2d 307 (2000); Buczkowski v. McKay, 441 Mich. 96, 108, n. 16, 490 N.W.2d 330 (1992); Placek v. Sterling Hts., 405 Mich. 638, 673, n. 18, 275 N.W.2d 511 (1979). This assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee. It is only a present situation on the premises, not any past incidents, that creates a duty to respond.
Subjecting a merchant to liability solely on the basis of a foreseeability analysis is misbegotten. Because criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere. However, even police, who are specially trained and equipped to anticipate and deal with crime, are unfortunately unable universally to prevent it. This is a testament to the arbitrary nature of crime. Given these realities, it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties. [Id. at 334-335, 628 N.W.2d 33 (emphasis in original and added).]
MacDonald confirms the long-established rule that there is no general duty to anticipate and prevent criminal activity even where, unlike the present case, there have been prior incidents and the site of the injury is a business premises. Any duty is limited to reasonably responding to situations that occur on the premises and pose a risk of imminent and foreseeable harm to identifiable invitees, and the duty to respond is limited to contacting the police.
Logic compels the conclusion that defendants in this case had no duty to anticipate and prevent the act of murder committed by Schmitz three days after *203 leaving defendants' studio and hundreds of miles away. Here, the only special relationship, if any, that ever existed between defendants and plaintiffs' decedent, or between defendants and Schmitz, was that of business invitor to invitee. However, any duty ends when the relationship ends, MacDonald, supra; Murdock, supra at 54-55, 559 N.W.2d 639; Williams, supra; 2 Restatement of Torts, 2d, § 314A, comment c, p. 119, and in this instance the invitor/invitee relationship ended on March 6, 1995, three days before the murder, when Schmitz and Amedure peacefully left the Chicago studio following the taping of the episode. Because the evidence, even when viewed from a perspective most favorable to plaintiffs, revealed no ongoing special relationship at the time of the murder,[3] defendants owed no duty to protect plaintiffs' decedent from Schmitz' violent attack on March 9, 1995. The present situation simply cannot, under any reasonable interpretation of the circumstances, be construed as involving an existing special relationship that required defendants to respond to a risk of imminent and foreseeable harm to an identifiable invitee on the premises. MacDonald, supra. Consequently, the trial court erred as a matter of law in denying defendants' motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict on the basis of lack of duty, an essential element of any negligence action. Maiden, supra; Buczkowski, supra.
Plaintiffs seek to characterize the case as one involving misfeasance, alleging that it was reasonably foreseeable that defendants' conduct both in creating and taping an episode on the topic of same-sex crushes and in actively creating a volatile situation would cause Schmitz to murder Amedure. A duty may be imposed in cases of alleged misfeasance where, notwithstanding the general rule that criminal conduct is unforeseeable as a matter of law, the third party's criminal conduct is a reasonably foreseeable consequence of the defendant's actions under the particular circumstances of the case. See, generally, Williams, supra at 498, 418 N.W.2d 381; Ross, supra at 187, 559 N.W.2d 331; 2 Restatement of Torts, 2d, § 302B, p. 88, and § 314A, p. 118. However, here, we agree with defendants that such a rationale is wholly unavailing. As previously noted, "[c]riminal activity, by its deviant nature, is normally unforeseeable," Papadimas, supra at 46-47, 439 N.W.2d 280, and thus "`[u]nder all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.'" Id., quoting Prosser, § 33, p. 201. This case presents no exceptional circumstances warranting departure from that general rule because the evidence at trial disclosed no "reason to expect the contrary" here. Schmitz gave every appearance of being a normal, well-adjusted adult who consented to being surprised on the show by a secret admirer of unknown sex and identity. The evidence of record indicates that nothing in Schmitz' demeanor, or in any of his interactions with the show, put defendants on notice that he *204 posed a risk of violence to others.[4] Reasonable foreseeability is a necessary prerequisite to any finding of a duty under Michigan law. Buczkowski, supra; cf. Groncki v. Detroit Edison Co., 453 Mich. 644, 657, 557 N.W.2d 289 (1996) (opinion by Brickley, C.J.). Viewed from a perspective most favorable to plaintiffs, the evidence failed to establish a jury question regarding whether it was reasonably foreseeable that Schmitz would murder Amedure as the natural and probable result of the events on the show. Accordingly, the trial court should have ruled that the murder was not foreseeable as a matter of law and entered judgment in favor of defendants. See Buczkowski, supra at 108, n. 16, 490 N.W.2d 330 (emphasizing that because there was no evidence of actual notice of "abnormal behavior," the "retailer [who sold ammunition to an allegedly intoxicated person] was entitled to proceed on the assumption that the purchaser would obey the criminal law"), and Johnson v. Detroit, 457 Mich. 695, 712, 579 N.W.2d 895 (1998) (opinion by Mallett, C.J.) ("defendants could not have suspected that the decedent [who committed suicide in a police station holding cell by using exposed overhead bars that originally had been covered with mesh but were exposed because the mesh had been torn away and had not been repaired despite knowledge of the problem by the police] was suicidal. Consequently, there was no duty to prevent this unforeseeable death."). To impose a duty based on a misfeasance theory under the circumstances at hand would expand the concept of duty to limitless proportions.

III
Finally, to the extent the torts of misrepresentation and intentional infliction of emotional distress were either pleaded as alternative theories of recovery or incorporated into the cause of action, over defendants' objection, by the trial court's jury instructions, we conclude that such claims must fail as a matter of law. Amedure's estate cannot recover under the separate tort of intentional misrepresentation, based on defendants' alleged statements to Schmitz, a third party. Hi-Way Motor Co. v. Int'l Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976).[5] The elements of intentional infliction of emotional distress are similarly lacking. See Roberts v. Auto-Owners Ins. Co., 422 Mich. 594, 602, 374 N.W.2d 905 (1985). The mental distress that is the subject of this case was allegedly inflicted on Schmitz, a nonparty to this appeal, not on *205 plaintiffs' decedent. Therefore, this count could not be sustained as a matter of law.

IV
In sum, we conclude that defendants owed no duty as a matter of law to protect plaintiffs' decedent from the intentional criminal acts of a third party, Jonathan Schmitz, that occurred three days after the taping of the Jenny Jones Show. While defendants' actions in creating and producing this episode of the show may be regarded by many as the epitome of bad taste and sensationalism, such actions are, under the circumstances, insufficient to impute the requisite relationship between the parties that would give rise to a legally cognizable duty. The trial court therefore erred in denying defendants' motions in this regard. Because we find no antecedent duty, we need not address the other issues raised by defendants on appeal. Accordingly, we reverse the judgment, vacate the order, and remand to the trial court with directions that it enter a judgment and order in favor of defendants.
Judgment reversed, order vacated, and case remanded. We do not retain jurisdiction.
METER, J., concurred.
MURPHY, P.J.,(dissenting).
I respectfully dissent from the majority's opinion because the issue of foreseeability concerning the shotgun slaying was properly placed in the hands of the jury. Viewing the evidence in a light most favorable to plaintiffs, I believe that the issue was properly left to the jury where the evidence indicated that Jonathan Schmitz was humiliated and devastated on a show scheduled to be broadcast[1] on national television by defendants through the revelation of a homosexual crush and lurid sexual fantasy by Scott Amedure after Schmitz told defendants that he did not want the crush to be that of another man, and where defendants nonetheless proceeded with the production of the show, using deceit, sensationalism, and outrageous behavior. I reach my conclusion taking into consideration Schmitz' personal history, which included mental illness, alcohol and drug abuse, suicide attempts, anger management problems, and sexual identity concerns. Certainly, reasonable men and women could differ on whether Schmitz' violent act foreseeably resulted from defendants' actions in manipulating and exploiting the lives, emotions, and sexual identities of individuals for the purpose of producing their television talk show.[2]
The existence of a legal duty in a negligence action is a question of law that this Court reviews de novo. Cipri v. Bellingham Frozen Foods, Inc., 235 Mich.App. 1, 14, 596 N.W.2d 620 (1999). However, where there are factual circumstances that give rise to a legal duty, the existence or nonexistence of those facts must be decided by a jury. Aisner v. Lafayette Towers, 129 Mich.App. 642, 645, 341 N.W.2d 852 (1983). Whether the risk of harm from third-party criminal activity is foreseeable in a particular case is generally a question of fact for the jury. Holland v. Liedel, 197 Mich.App. 60, 63, 494 N.W.2d 772 (1992). Although the question of duty is ordinarily one of law to be decided by the court, where a determination of duty depends on factual findings, those findings must be *206 found by the jury. Id. at 65, 494 N.W.2d 772.
Defendants' arguments regarding duty arose below in the context of defendants' motions for summary disposition, a directed verdict, and judgment notwithstanding the verdict (JNOV). Each of those motions is reviewed de novo by this Court. Spiek v. Dep't of Transp., 456 Mich. 331, 337, 572 N.W.2d 201 (1998); Cacevic v. Simplimatic Engineering Co. (On Remand), 248 Mich.App. 670, 679, 645 N.W.2d 287 (2001); Morinelli v. Provident Life & Accident Ins. Co., 242 Mich.App. 255, 260, 617 N.W.2d 777 (2000).[3]
In Terry v. Detroit, 226 Mich.App. 418, 424, 573 N.W.2d 348 (1997), this Court outlined the following general principles concerning a negligence action:
In order to establish a prima facie case of negligence, the plaintiff must prove: "(1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages; and (4) that the plaintiff suffered damages." Baker v. Arbor Drugs, Inc., 215 Mich.App. 198, 203, 544 N.W.2d 727 (1996). Duty is an obligation that the defendant has to the plaintiff to avoid negligent conduct. Id. Whether a duty exists is a question of law for the court. Simko v. Blake, 448 Mich. 648, 655, 532 N.W.2d 842 (1995). If a court determines as a matter of law that a defendant owed no duty to a plaintiff, summary disposition is appropriate under MCR 2.116(C)(8). Dykema v. Gus Macker Enterprises, Inc. [,] 196 Mich. App. 6, 9, 492 N.W.2d 472 (1992).
In determining whether a duty exists, courts look to different variables, including the (1) foreseeability of the harm, (2) degree of certainty of injury, (3) existence of a relationship between the parties involved, (4) closeness of connection between the conduct and injury, (5) moral blame attached to the conduct, (6) policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. Buczkowski [v. McKay, 441 Mich. 96, 101, 490 N.W.2d 330 (1992) ], citing Prosser & Keeton, Torts (5th ed.), § 53, p. 359, n. 24; Baker, supra.

One of the initial difficulties in addressing the issues presented in this case is the development of the proper analytical framework. In Babula v. Robertson, 212 Mich.App. 45, 52, n. 2, 536 N.W.2d 834 (1995), this Court, quoting Moning v. Alfono, 400 Mich. 425, 437-438, 254 N.W.2d 759 (1977), stated:
"`Duty' comprehends whether the defendant is under any obligation to the plaintiff to avoid negligent conduct; it does not includewhere there is an obligationthe nature of the obligation: the general standard of care and the specific standard of care.... While the court decides questions of duty, general *207 standard of care and proximate cause, the jury decides whether there is cause in fact and the specific standard of care: whether defendants' conduct in the particular case is below the general standard of care, includingunless the court is of the opinion that all reasonable persons would agree or there is an overriding legislatively or judicially declared public policywhether in the particular case the risk of harm created by the defendants' conduct is or is not reasonable." [Emphasis in original.]
The Babula panel noted that the questions of duty and proximate cause are interrelated because the question whether there is the requisite relationship, giving rise to a legal duty, and the question whether the cause is so significant and important as to be regarded a proximate cause both depend in part on foreseeability. Babula, supra at 53, 536 N.W.2d 834.
The first matter that needs to be addressed in properly analyzing the duty issue is whether plaintiffs' action is premised on nonfeasance or misfeasance. I specifically disagree with that portion of the majority's opinion that implicitly focuses on the concept of nonfeasance and the necessarily incorporated principles concerning the duty to protect and the necessity of a special relationship. Such an analysis is inapplicable in this case, a case of misfeasance, not nonfeasance.
In Ross v. Glaser, 220 Mich.App. 183, 184-185, 559 N.W.2d 331 (1996), the personal representative of the decedent's estate brought suit against the father of an adult son after the son, who had a history of mental illness, shot the decedent with a gun provided by the father, which gun was given to the son while he was in an agitated state. This Court reversed the trial court's order granting summary disposition to the defendant. Id. at 184, 559 N.W.2d 331. The Ross panel, distinguishing misfeasance from nonfeasance, stated:
In this case, defendant argues that he has no duty to control the conduct of third parties absent a special relationship to them, particularly when the conduct is criminal. He asserts that the father-son relationship is insufficient to establish the required special relationship that would impose a duty on him.
The argument is unavailing. Michigan courts have distinguished active misconduct causing personal injury (misfeasance) and passive inaction or the failure to protect others from harm (nonfeasance). Generally, with respect to nonfeasance, there is no legal duty that obligates a person to aid or protect another. An exception has developed where a special relationship exists between the persons.
However, defendant's act of handing a loaded gun to [his son] was not one of nonfeasance, but rather misfeasance. Therefore, the special relationship doctrine is inapplicable.... Instead, we must determine whether defendant had a duty to refrain from handing [his son] a loaded weapon.

* * *
As to foreseeability, we determine whether it is foreseeable that the conduct may create a risk of harm to the victim and whether the result and intervening causes were foreseeable. [Id. at 186-187, 559 N.W.2d 331 (citations omitted).]
The Ross panel concluded that summary disposition was improper because the likelihood of injury was high where the mentally ill son was handed a loaded gun while in an agitated state and in conflict with antagonists. Id. at 189, 559 N.W.2d 331. Ross makes clear that principles regarding the duty to protect another from the criminal *208 acts of third parties and the necessity of a special relationship do not apply in cases of misfeasance.
The essence of plaintiffs' case is premised on misfeasance, or active misconduct, as opposed to nonfeasance or passive inaction, which would require a special relationship, because plaintiffs challenged defendants' actions in producing the same-sex crush show.[4] Plaintiffs were not asserting liability based on defendants' failure to properly respond to Schmitz' pointing a shotgun at Amedure or failure to actively protect Amedure from Schmitz' actions, nor, on close inspection, is plaintiffs' action premised on defendants' failure to anticipate or prevent Schmitz' criminal act. Rather, plaintiffs' action focuses on defendants' active misconduct that allegedly created a risk of foreseeable harm to Amedure, which conduct included lies, deceit, and outrageous behavior. Although it is true that certain aspects of plaintiffs' claims involved inaction, such as the failure to check into Schmitz' background, the claims are all in the context of the manner in which the show was produced, which is a matter of active misconduct.
The majority mistakenly relies on MacDonald v. PKT, Inc., 464 Mich. 322, 628 N.W.2d 33 (2001), in support of its position. MacDonald, id. at 345, 628 N.W.2d 33, specifically reaffirmed our Supreme Court's earlier decision in Williams v. Cunningham Drug Stores, Inc., 429 Mich. 495, 418 N.W.2d 381 (1988), in which the Supreme Court stated:
In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. [Id. at 498, 418 N.W.2d 381 (emphasis added).]
In MacDonald, supra at 345-346, 628 N.W.2d 33,[5] the Supreme Court, addressing the duty of premises owners concerning the criminal acts of third parties, held:
[W]e conclude that merchants have a duty to respond reasonably to situations occurring on the premises that pose a risk of imminent and foreseeable harm to identifiable invitees. We hold that *209 the duty to respond is limited to reasonably expediting the involvement of the police, and that there is no duty to otherwise anticipate the criminal acts of third parties. Finally, we affirm that merchants are not required to provide security personnel or otherwise resort to self-help in order to deter or quell such occurrences."
The Supreme Court additionally held that there is no duty to prevent the criminal acts of third parties. Id. at 326, 628 N.W.2d 33. The MacDonald Court did not hold that there was no duty to avoid actively creating a volatile situation that gives rise to a criminal act.
Defendants focus on the lack of any duty owed to Amedure. Based on the case law cited above, the determination whether defendants owed a duty to Amedure to avoid negligent conduct depended on the conduct at issue in relation to the harm claimed. In other words, the relevant inquiry in determining the existence of a duty is whether defendants should have refrained from producing and taping a same-sex crush show in the fashion it was done and under the circumstances presented, where plaintiffs asserted that the conduct caused physical harm and death to Amedure.[6] In determining whether defendants should have refrained from producing the same-sex crush show in light of the alleged harm, we must examine whether the harm was foreseeable in that context. Reversal is mandated only if we can rule, as a matter of law and viewing the evidence in a light most favorable to plaintiffs, that a violent response by Schmitz was not foreseeable under the circumstances of this case.
A duty arises if events are foreseeable. Groncki v. Detroit Edison Co., 453 Mich. 644, 657, 557 N.W.2d 289 (1996). "Criminal activity, by its deviant nature, is normally unforeseeable." Papadimas v. Mykonos Lounge, 176 Mich.App. 40, 46-47, 439 N.W.2d 280 (1989). The Papadimas panel, id. at 47, 439 N.W.2d 280, quoting Prosser & Keeton, Torts (5th ed.), § 33, p. 201, noted that "`[u]nder all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law.'" "It is not necessary that the manner in which a person might suffer injury be foreseen or anticipated in specific detail." Ross, supra at 188, 559 N.W.2d 331.
Plaintiffs rely, in part, on Pamela L v. Farmer, 112 Cal.App.3d 206, 207-209, 169 Cal.Rptr. 282 (1980), where the California Court of Appeals reversed a summary disposition granted in favor of the defendant wife, where the wife knew of her defendant husband's history of molesting women and children when she encouraged and invited the plaintiff minors to use the swimming pool at her house and told the minors' parents that it was safe for their children to play at her house while she was at work and her husband was home. The court ruled, in part, that if the allegations were true, the wife could have been held to have unreasonably exposed the minors to harm. Id. at 211, 169 Cal.Rptr. 282. The court also ruled that "where the defendant, through his or her own action (misfeasance) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person[,]" liability may arise. Id. at 209, 169 Cal.Rptr. 282. The principles enunciated in Ross parallel those in Pamela L.
Defendants rely on Johnson v. Detroit, 457 Mich. 695, 697, 699-700, 579 N.W.2d *210 895 (1998), in which the decedent committed suicide in a police station holding cell through use of exposed overhead bars that originally had been covered by mesh but were exposed because the mesh had been torn away and had not been repaired. Although the defendant was aware of the need to repair the problem, it had failed to do so. Our Supreme Court, rejecting the plaintiff's negligence claim, stated:
In her negligence claim, the plaintiff has to establish that the defendant had a duty to this particular decedent, that it breached that duty by placing the decedent in the defective cell, and that the breach was a proximate and factual cause of the decedent's death. A defendant does not owe a duty to an unforeseeable plaintiff. In this case, plaintiff failed to present a genuine issue of material fact establishing the existence of a duty owed to plaintiff's decedent because defendants were actually unaware, and it was not reasonably foreseeable, that the decedent was suicidal before placing him in the defective cell....
... [O]fficers testified that the decedent gave no indication that he was suicidal. Conversely, the plaintiff presented nothing to refute this evidence and did not offer any evidence that the suicide was reasonably foreseeable.
Where the events leading to injury are not foreseeable, there is no duty, and summary disposition is appropriate. Groncki v. Detroit Edison Co., 453 Mich. 644, 657, 557 N.W.2d 289 (1996). In this case, the defendants had no notice that the decedent might attempt suicide, and therefore they cannot be held responsible for failing to prevent the decedent's death. This death was not reasonably foreseeable. Tragic as it was, defendants cannot be held responsible for the unforeseen suicide of the plaintiff's decedent. [Johnson, supra at 711-712, 579 N.W.2d 895.]
Johnson leads to the issue whether Schmitz' personal history, which included depression, alcohol and drug abuse, suicide attempts, anger management problems, and sexual identity concerns, should be taken into account in determining whether a violent response was foreseeable, where there was no evidence that defendants knew about Schmitz' personal or psychiatric history.[7] The majority states, when it does reach the issue of misfeasance, that "Schmitz gave every appearance of being a normal, well-adjusted adult who consented to being surprised on the show by a secret admirer of unknown sex and identity." Ante at ___, 656 N.W.2d at 203. For the most part, I agree with this statement.[8]
The matter presents a unique situation in the law regarding the foreseeability of third-party criminal acts because ordinarily one would not have the opportunity to look into the personal history of the criminal actor's life or even know who the criminal actor was going to be before the negligent act occurred; however, here the show knew that it was going to surprise Jonathan Schmitz and cause some type of emotional reaction before it proceeded with its intentional act. In Johnson, supra, where the Supreme Court relied on the lack of notice of suicidal tendencies, the police did not have the opportunity or ability to review the decedent's background, let alone *211 know his identity, in order to make an assessment of any suicidal tendencies before arresting him and putting him in the holding cell, and to require the police to do so would be unreasonable; they were only able to assess any suicidal tendencies on the basis of his interaction with the police at the time of the arrest. In Ross and Pamela L., supra, the defendants knew of the criminal actors' personal history because the actors were family members.
The question should not involve whether the show must be required or has a duty to make an inquiry into the background of a particular person, the failure of which may result in liability, but rather whether defendants should be charged with the knowledge of the actual history for the purpose of foreseeability analysis.
I would hold that as a matter of public policy, if defendants, for their own benefit, wish to produce "ambush" shows that can conceivably create a volatile situation, they should bear the risk if a guest is psychologically unstable or criminally dangerous by being charged with that knowledge in the context of any foreseeability analysis. "`Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Terrien v. Zwit, 467 Mich. 56, 68, 648 N.W.2d 602 (2002), quoting Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945). Analogous legal precedents form the basis of my public policy position.
In Richman v. City of Berkley, 84 Mich. App. 258, 261, 269 N.W.2d 555 (1978), this Court stated that it "is a basic tort rule of lawa tortfeasor takes his victim as he finds him." In a separate dissenting opinion in Pierce v. Gen. Motors Corp., 443 Mich. 137, 155-156, 504 N.W.2d 648 (1993), Justice Levin noted that all first-year law school students are taught that a tortfeasor takes his victim as he finds him as explained through the example of the man with an eggshell skull; one is responsible for the consequences of hitting a person on the head and cracking the skull even if the skull was weak to begin with and one gave only a slight blow as a joke. Finally, our Supreme Court in Wilkinson v. Lee, 463 Mich. 388, 396-397, 617 N.W.2d 305 (2000), quoting with approval 2 Restatement Torts, 2d, § 461, p. 502, and the accompanying comment, stated:
"The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct."
"The rule stated in this Section applies not only where the peculiar physical condition which makes the other's injuries greater than the actor expected is not known to him, but also where the actor could not have discovered it by the exercise of reasonable care, or, indeed even where it is unknown to the person suffering it or to anyone else until after the harm is sustained. A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent."
I would apply these principles by analogy to the case sub judice. Although Amedure, through his estate, was the "victim" for purposes of the instant action, the alleged misfeasance was also directed at Schmitz, and on the basis of the very unique circumstances of this case, defendants should take Schmitz as they found him, making it appropriate to consider Schmitz' personal history in determining foreseeability. To rule otherwise would allow television, radio, or other media outlets to undertake similar actions as occurred here without limit and claim lack of *212 foreseeability in the face of a civil action because they lacked knowledge concerning the history of a person they set up for ridicule. The Wilkinson Court concluded that "[t]he fact that this particular plaintiff was unusually vulnerable to head injuries does not relieve the defendants of responsibility for those damages." Wilkinson, supra at 397, 617 N.W.2d 305. Likewise, the fact that Schmitz was unusually vulnerable should not relieve defendants of their responsibility. For purposes of foreseeability analysis, defendants should be made to bear the risk where a guest is psychologically unstable or criminally dangerous and defendants acted intentionally in producing the show for their own benefit.
I am not asserting that defendants should not be allowed to produce shows of this kind, nor that they must be required to make inquiry into the personal backgrounds of guests (although an industry practice to make minimal inquiry could be beneficial to all), but only that if they wish to produce "ambush" shows through the exploitation of guests, they must take those guests as they are.[9]
Considering the evidence in a light most favorable to plaintiffs, the show used lies, deceit, sensationalism, and outrageous behavior, while playing with human emotions, in order to orchestrate a grand surprise for the benefit of its audience and ratings, which caused Schmitz to suffer deep embarrassment, humiliation, and extreme anger. Taking into consideration Schmitz' personal mental frailties and dangerous inclinations, those circumstances could lead reasonable jurors to draw different conclusions regarding whether it was foreseeable that Schmitz would commit an act of violence against Amedure.[10] Therefore, resolution by the jury was appropriate.
In view of the majority's opinion to reverse on the basis of the "duty" issue, other than to record my disagreement with the analysis by the majority in this dissent, I see no value in attempting to address the other issues raised on appeal.
NOTES
[1] Jonathan Schmitz, the sole original defendant in this case before plaintiffs amended their complaint to add the present defendants, was dismissed from the suit as a result of a settlement agreement.
[2] The taped segment was never broadcast.
[3] Plaintiffs argue that the special relationship between defendants and Schmitz and Amedure did not end when Schmitz and Amedure left the show. Plaintiffs analogize to a dramshop action, in which a bar may be held liable for a drunk-driving accident after improperly serving alcoholic beverages to a drunk driver even though the driver at the time of the accident was no longer on the premises. However, a dram shop action is statutory in nature and involves serving liquor to a visibly intoxicated person. In this case, Schmitz was neither visibly upset nor dangerous during the taping of the show.
[4] In this regard, the present case differs substantially from Ross, supra, in which a divided panel of this Court found a duty to protect against the criminal acts of a third party based on a theory of misfeasance. The Ross majority focused on the defendant's actual knowledge that his son suffered from chronic mental problems and of a history of conflicts between his son and some neighbors. In those circumstances, the defendant's decision to hand his son a loaded gun at the moment one such conflict was flaring up was found to entail a foreseeable risk of injury. Ross, supra at 188, 559 N.W.2d 331. The Ross Court expressly distinguished Buczkowski, supra, on the ground that in Buczkowski, as here, "there was no evidence that the customer acted in a threatening manner or was legally incompetent." Id. at 189, 559 N.W.2d 331. The Court also relied on the "proximity in time between defendant's conduct and the shooting," id., explaining that the shooting occurred "just minutes after defendant handed [his son] a loaded gun," id. at 193, 559 N.W.2d 331, not days later and a long distance away as in the instant case.
[5] Moreover, assuming the alleged misrepresentation was not a separate cause of action but rather a manifestation of plaintiffs' negligence claim, as already noted, no ongoing special relationship existed between defendants and Amedure on the day of the unforeseeable murder; thus, defendants owed no duty to prevent Schmitz' criminal conduct.
[1] Although the taped segment was never broadcast, presumably because of the tragic event that unfolded, it is clear from the record that Schmitz anticipated that it would be.
[2] Although Schmitz first declined to appear on the show, he subsequently decided to appear because, in part, he believed that there was a chance he could meet the love of his life or get back together with his ex-girlfriend.
[3] In evaluating a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in a light most favorable to the nonmoving party. Maiden v. Rozwood, 461 Mich. 109, 120, 597 N.W.2d 817 (1999). In a motion under subsection C(8), all factual allegations in support of the claim are accepted as true and construed in a light most favorable to the nonmoving party. Maiden, supra at 119, 597 N.W.2d 817. The test for evaluating a motion for a directed verdict and JNOV is identical. Smith v. Jones, 246 Mich.App. 270, 273-274, 632 N.W.2d 509 (2001). The evidence and all legitimate inferences therefrom must be viewed in a light most favorable to the nonmoving party. Wilkinson v. Lee, 463 Mich. 388, 391, 617 N.W.2d 305 (2000).
[4] Defendants argue in their reply brief that plaintiffs did not request a jury instruction based on misfeasance, nor did the trial court ever rule that alleged misfeasance was an appropriate basis for imposing liability. Defendants' argument lacks merit. The trial court and plaintiffs continually referred to this case as a simple negligence case, or a "classic case of negligence." The trial court denied the initial motion for summary disposition, in part, because plaintiffs alleged that the show actively created a volatile situation. In its instructions, the court instructed the jury: "Therefore, by `negligence,' I mean the failure to do something that a reasonably careful television production company would do, or the doing of something that a reasonably careful television production company would not do under the circumstances that you find existed in this case." Moreover, plaintiffs sought instructions regarding affirmative acts, e.g., misrepresentation and intentional infliction of emotional distress.
[5] The Supreme Court noted the factual circumstances, stating that

[i]n these consolidated premises liability cases, plaintiffs seek to recover for injuries they suffered when fellow concertgoers at the Pine Knob Music Theater ..., an outdoor amphitheater that offered seating on a grass-covered hill, began pulling up and throwing pieces of sod. We granted leave to address the duty of premises owners concerning the criminal acts of third parties. [MacDonald, supra at 325, 628 N.W.2d 33.]
[6] In Ross, supra at 187, 559 N.W.2d 331, this Court stated that "we must determine whether defendant had a duty to refrain from handing Anthony a loaded weapon."
[7] This evidence was presented to the jury through the testimony of plaintiffs' experts and individuals with personal knowledge of Schmitz' life, including his ex-girlfriend with whom he had lived.
[8] There was some testimony presented that one of the show's producers was so annoyed by Schmitz' constant telephone calls before the show that if Schmitz called one more time, the producer would smack him.
[9] If a show were to surprise a person about a spouse's infidelities, and the surprised spouse had a history of numerous convictions for felonious and brutal assaults against domestic partners, it would only be appropriate to attribute knowledge of that history to the producers of such a show where the unfaithful spouse is subsequently harmed by the surprised spouse because of the public revelation.
[10] The jury was also presented with expert testimony about the potential dangerous repercussions of producing shows of this nature and with testimony that warnings concerning these dangers were actually given to defendants before the taping of the show at issue.